## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SOLOS TECHNOLOGY LIMITED, | ) | |
| | ) | Case No. |
| Plaintiff, | ) | |
| | ) | Jury Trial Demanded |
| v. | ) | |
| | ) | |
| META PLATFORMS, INC., | ) | |
| META PLATFORMS TECHNOLOGIES, LLC, | ) | |
| OAKLEY, INC., | ) | |
| LUXOTTICA OF AMERICA, INC. AND | ) | |
| ESSILORLUXOTTICA USA, INC. | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT FOR PATENT INFRINGEMENT

1.     Plaintiff, Solos Technology Limited ("Solos"), through its undersigned counsel, brings the following allegations, and asserts the following claims against the above-named Defendants, Meta Platforms, Inc. and Meta Platforms Technologies, LLC (collectively, "Meta"), Oakley, Inc. ("Oakley"), and Luxottica of America, Inc. and EssilorLuxottica USA, Inc. (collectively, "EssilorLuxottica" and together with Meta and Oakley, the "Defendants"), to enforce its patents and obtain monetary and injunctive relief.

## NATURE OF THE ACTION

2.     This is an action for willful direct and indirect patent infringement seeking damages in the multiple billions of dollars arising from Defendants' infringement of Solos' smart-glasses technologies.

3.     Solos is a long-standing innovator in the smart-glasses industry and has continuously researched, designed, engineered, and commercialized head-worn wearable systems

1

for more than a decade. Smart glasses represent a fundamental shift in how humans access, process, and interact with digital information. Unlike traditional mobile devices, which require users to divert their attention to a handheld screen, smart glasses integrate computation, sensing, and display directly into the user's natural field of view. This hands-free, heads-up architecture dissolves the boundary between what a user sees and what a user knows, enabling information to be delivered contextually, continuously, and in real time as part of the user's ordinary visual experience.

4.      Smart glasses do not merely replicate the functions of a smartphone in a different form factor. They rearchitect personal computing itself. This transformation requires complex and highly specialized system architectures involving multimodal sensing, real time signal processing, directional audio, sensor fusion, and contextual awareness. It is these foundational technologies, pioneered, developed, and patented by Solos, that lie at the center of this action.

5.      Specifically, this willful infringement suit concerns Solos' United States Patent Nos. 10,306,389 ("the '389 Patent"), 10,651,866 ("the '866 Patent"), 11,082,055 ("the '055 Patent"), 11,871,174 ("the '174 Patent"), and 12,216,339 ("the '339 Patent") (collectively, the "Asserted Patents"), in violation of 35 U.S.C. § 271. The Asserted Patents disclose and claim core technologies in the field of smart eyewear, including without limitation, multimodal sensing, beamforming and audio processing, sensor fusion, contextual and activity determination, intelligent assistance, and integrated system architectures that support real-time user interaction. Solos secured patent protection for these innovations years before Defendants began developing their smart-glasses programs.

2

6.    Defendants' infringement also includes platform-level architecture designed to enable third parties, including application developers, content providers, and commercial partners, to build, deploy, and commercialize products and services that rely on the same infringing audio, sensing, processing, and contextual-assistance capabilities. Meta has architected, exposed, and promoted these capabilities as core platform features, making downstream infringing use by participants a foreseeable and intended consequence of Defendants' design and commercialization choices.

7.    Furthermore, Meta personnel gained an understanding of Solos' technology through review of Solos' technical materials and by employing individuals familiar with Solos' technology. This exposure was documented in a technical study that expressly cited Solos' patents and analyzed Solos' smart-eyewear architecture.

8.    One concrete example of this exposure is the research and subsequent employment of Priyanka Shekar. Former MIT Sloan Fellow, Priyanka Shekar ("Shekar"), conducted an in-depth research study beginning in 2020, analyzing Solos' AirGo system and evaluating Solos' differentiated audio, and published a research study "Audio Wearable Product Strategy: Expanding User Experience for Solos Smart Glasses." Sehkar subsequently joined Meta Reality Labs as a Product Manager.

9.    Shekar's research and report underscore the commercial significance of Solos' technologies by detailing Solos' strengths in open-ear audio, sensor integration, and user-centered wearable computing and expressly citing Solos' patents. Most notably, and as alleged below, the report states that Solos' technology is protected by more than 30 patents and identifies as a key

strength that Solos' patented technology can be applied to various form factors to suit different uses.

10.    In her role as Product Manager at Meta, where she contributed to early smart-glasses initiatives under the Ray-Ban partnership, Shekar's knowledge gave Meta access to Solos' patented solutions and their relevance to smart-glasses development.

11.    As such, by the time the Defendants jointly entered the smart-glasses market, these companies had actual knowledge of Solos' patented solutions and nonetheless proceeded with product development that adopted the same fundamental architectural concepts claimed in the Asserted Patents.

12.    For instance, in 2021, Meta and EssilorLuxottica S.A.[1], acting through its U.S.-based subsidiaries, jointly launched the Ray-Ban Stories as their first commercial smart-glasses product. The Stories embodied and implemented foundational sensing, audio, and contextual-analysis concepts that appear throughout the infringing product lines. Subsequent releases built upon, refined, and reused these same concepts within a shared and evolving core hardware and software architecture that was later implemented across multiple product generations.

_____

[1] EssilorLuxottica S.A. is a global eyewear conglomerate formed in 2018 through the merger of Essilor International S.A. and Luxottica Group S.p.A. The EssilorLuxottica corporate group operates through a network of subsidiaries and affiliated entities engaged in the design, manufacture, marketing, distribution, and retail sale of eyewear products, including lenses, frames, and smart-glasses, worldwide, including within the United States. As used herein, the term "EssilorLuxottica Group" refers collectively to EssilorLuxottica S.A. and its U.S. and foreign subsidiaries, affiliates, and other related entities that operate in coordination with one another.

The precise nature, scope, and extent of the relationships among these entities, including the allocation of responsibilities for U.S.-directed activities, lines of reporting, the existence and allocation of any U.S.-focused decision-making authority, product development and architecture decisions, U.S. commercialization strategies, and the flow of revenues and profits derived from U.S. sales and operations, are not presently known to Plaintiff.

13.    These products implement the sensing, processing, and contextual-analysis features claimed in the Asserted Patents. Defendants continued to commercialize expanded versions of these systems regardless of Solos' patent portfolio and the overlap between the patented technologies and the features incorporated into Defendants' products.

14.    Despite this knowledge, Defendants have made, used, sold, offered for sale, and imported within the United States lines of wearable smart glasses marketed under the "Meta Ray-Ban" and "Oakley Meta" brands, including but not limited to, the Stories, Wayfarer Gen 1, Wayfarer Gen 2, Skyler Gen 2, Headliner Gen 2, Display, Oakley Meta HSTN, and all variants and derivative versions thereof, including any updates, modifications, rebranded versions, successor products, and substantially similar implementations (collectively, the "Infringing Products").

15.    Defendants' infringement has already generated hundreds of millions of dollars in revenue and threatens to generate billions more if left unchecked, to the ongoing detriment of Solos. For example, estimates by Barclays indicate that the Meta–Ray-Ban smart-glasses collaboration generated approximately $426 million in revenue in 2024, is projected to have more than doubled to as much as $1.1 billion in 2025, and is forecast to reach $10 billion by 2030. These revenues are being generated through sales and commercialization activities carried out by Meta and EssilorLuxottica, including Ray-Ban–branded smart-glasses product lines, and are expected to increase further through Meta–Oakley-branded product lines.

16.    Accordingly, Solos seeks monetary damages to compensate for Defendants' infringement, enhanced damages for willful infringement, and an award of attorneys' fees and costs under the Patent Act. Solos also seeks injunctive relief, including permanent injunctive relief

to prevent Defendants' ongoing and future infringement of the Asserted Patents, and all other forms of equitable relief warranted by the exceptional nature of this case.

## THE PARTIES

17.     Plaintiff Solos Technology Limited is a Hong Kong corporation with its U.S. principal place of business at 245 Main Street, 2F, Cambridge, Massachusetts 02142.

18.     Defendant Meta Platforms, Inc. is a Delaware corporation with its principal place of business at 1 Meta Way, Menlo Park, California 94025.

19.     Defendant Meta Platforms Technologies, LLC is a Delaware limited liability company with its principal place of business at 1 Meta Way, Menlo Park, California 94025.

20.     Defendant Oakley, Inc. is a Washington corporation with its principal place of business at 1 Icon, Foothill Ranch, California 92610.

21.     Defendant Luxottica of America, Inc. is an Ohio corporation with its principal place of business at 4000 Luxottica Place, Mason, Ohio 45040.

22.     Defendant EssilorLuxottica USA, Inc. is a Delaware corporation with its principal place of business at 13555 North Stemmons Freeway, Dallas, Texas 75234.

## JURISDICTION AND VENUE

23.     This action arises under the patent laws of the United States, 35 U.S.C. § 1 et seq., including 35 U.S.C. § 271. Accordingly, this Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

### A.  Meta Platforms, Inc. ("Meta Platforms")

24.     This Court has personal jurisdiction over Defendant Meta Platforms, Inc. ("Meta Platforms") because Meta Platforms purposefully directs business activities toward, and conducts

substantial business within the Commonwealth of Massachusetts ("Massachusetts"), and thus within the District of Massachusetts (the "District"). Meta Platforms has committed, and continues to commit, acts of patent infringement within Massachusetts, including by making, using, importing, offering to sell, and selling the Infringing Products to consumers located in this District.

25. Meta Platforms places the Infringing Products into the stream of commerce with the expectation and knowledge that such products will be purchased, used, and enjoyed by consumers in this District. Meta Platforms distributes the Infringing Products throughout Massachusetts via authorized retail outlets, including Ray-Ban stores in Boston and Cambridge, online sales channels accessible to residents of this District, and through coordinated marketing, promotional, and support activities directed at Massachusetts consumers.

26. Meta Platforms is the ultimate parent corporation of Meta Platforms Technologies, LLC which comprises the research, product-development, and commercialization of Meta Platforms' augmented reality and virtual reality ("AR/VR") and smart-glasses products. As the controlling corporate entity, Meta Platforms benefits directly from, and exercises oversight over, the infringing activities of its subsidiaries.

27. Venue is proper in this District as to Meta Platforms under 28 U.S.C. § 1400(b) because it has committed acts of infringement in this District and maintains a regular and established place of business within the District, including its office located in Cambridge, Massachusetts, where technologies incorporated into the Infringing Products were, at least in part, researched and developed.

### B. Meta Platforms Technologies, LLC ("MPT")

28.    This Court has personal jurisdiction over Defendant Meta Platforms Technologies, LLC ("MPT") because MPT is a wholly owned subsidiary and operational arm of Meta Platforms that conducts research, product-development, engineering, and testing activities for AR/VR and smart-glasses technologies. MPT performs such work, at least in part, through offices located in Cambridge, Massachusetts, and therefore within this District. These activities contributed to the design, refinement, and functionality of the Infringing Products.

29.    MPT purposefully directs business, engineering, and research activities toward this District and actively participates in the creation, testing, support, and ongoing development of the Infringing Products, which are sold, offered for sale, and used within Massachusetts.

30.    Venue is proper in this District as to MPT under 28 U.S.C. § 1400(b) because it has committed acts of infringement in this District and maintains a regular and established place of business within the District, including research, engineering, and development operations carried out through its office in Cambridge, Massachusetts.

### C. Oakley, Inc. ("Oakley")

31.    This Court has personal jurisdiction over Defendant Oakley, Inc. ("Oakley") because Oakley purposefully directs business activities toward, and conducts substantial business within Massachusetts, and thus within this District. Oakley designs, markets, promotes, and sells Oakley-branded eyewear products, including the Oakley Meta HSTN smart glasses, which are offered for sale, sold, and used by consumers in this District through online and authorized third-party retail channels. Oakley has therefore committed, and continues to commit, acts of patent infringement within Massachusetts.

32.     Oakley places the Oakley Meta HSTN smart glasses into the stream of commerce with the expectation and knowledge that such products will be purchased and used by consumers in this District. Oakley distributes and markets Infringing Products, such as the Oakley Meta HSTN, through its e-commerce platforms and through authorized third-party retailers whose operations involve Massachusetts, including Sunglass Hut. Oakley also derives revenue from sales of the Infringing Products in this District.

33.     Oakley is a wholly owned subsidiary of Luxottica Group S.p.A., which is part of the EssilorLuxottica S.A. corporate group, and operates in close coordination with EssilorLuxottica with respect to the branding, marketing, distribution, and sale of Oakley-branded smart-eyewear products, including the Oakley Meta HSTN. Oakley has directly and actively participated in, supervised, and benefited from the commercialization of the Infringing Products.

34.     Venue is proper in this District as to Oakley under 28 U.S.C. § 1400(b) because it has committed acts of infringement in this District by selling and offering to sell the Infringing Products to customers in Massachusetts through its online platforms and authorized distribution channels, including through affiliated retail stores such as Sunglass Hut, and because Oakley acts in concert with and as part of a coordinated commercial enterprise with EssilorLuxottica, which maintains regular and established places of business in this District.

### D.  Luxottica of America, Inc. ("Luxottica America")

35.     Luxottica of America, Inc. is a U.S.-based operating subsidiary within the EssilorLuxottica S.A. corporate group that engages in the marketing, sale, importation, and distribution of Ray-Ban–branded eyewear and related products, including the Infringing Products, in this District.

36.     This Court has personal jurisdiction over Defendant Luxottica of America, Inc. ("Luxottica America") because it maintains continuous and systematic business activities within this District and engages in nationwide retail and distribution activities involving Massachusetts. Luxottica America sells, offers to sell, imports, and distributes the Infringing Products in this District, and therefore has committed acts of infringement in this District.

37.     Venue is proper in this District as to Luxottica America under 28 U.S.C. § 1400(b) because it has committed acts of infringement in this District and has a regular and established place of business within the District, including through retail locations and distribution operations associated with Ray-Ban–branded products within Massachusetts.

### E.  EssilorLuxottica USA, Inc. ("Essilor")

38.     EssilorLuxottica USA, Inc. is a U.S.-based subsidiary of EssilorLuxottica S.A. that functions as a centralized corporate entity within the EssilorLuxottica Group for purposes of oversight, coordination, and strategic direction of Luxottica-branded eyewear and Essilor-branded lens operations within the United States. EssilorLuxottica USA, Inc. ("Essilor") directs, authorizes, coordinates, and financially benefits from the retail, distribution, supply-chain, and merchandising activities of Luxottica of America, Inc., including activities related to the Meta Ray-Ban smart glasses sold in this District.

39.     This Court has personal jurisdiction over Essilor because it conducts substantial and continuous business operations within Massachusetts including involvement in and benefit from Ray-Ban retail locations, Sunglass Hut locations, LensCrafters locations, and related distribution channels through which the Infringing Products are sold. Essilor has participated in,

supervised, or benefited from the sale, distribution, and/or importation of the Infringing Products and has committed acts of patent infringement in this District.

40.     Venue is proper in this District as to Essilor under 28 U.S.C. § 1400(b) because it has committed acts of infringement within this District and maintains regular and established business operations within the District, including oversight and support of retail outlets, distribution networks, and sales channels through which the Infringing Products are marketed, offered for sale, and sold.

### F.  Collective Jurisdictional Basis

41.     Each Defendant, directly and/or through its subsidiaries, agents, distributors, and intermediaries, has purposefully availed itself of the privilege of conducting business in Massachusetts. Each Defendant derives revenue from commerce within this District, maintains ongoing relationships with retail stores located here, and targets Massachusetts consumers through marketing campaigns and retail infrastructure.

42.     Defendants have collectively and individually targeted this District with infringing products, derived revenue from sales of the Infringing Products in this District and profited from infringing conduct occurring in Massachusetts. Exercising personal jurisdiction over Defendants in this District is appropriate because each Defendant has established minimum contacts with the forum and this dispute arises from, or relates to, those contacts.

### THE ASSERTED PATENTS

43.     On May 28, 2019, the United States Patent and Trademark Office ("USPTO") duly and legally issued U.S. Patent No. 10,306,389 ("the '389 Patent"), entitled "Head Wearable

Acoustic System with Noise Canceling Microphone Geometry, Apparatuses and Methods." A true and accurate copy of the '389 Patent is attached hereto as Exhibit 1.

44.     On May 12, 2020, the United States Patent and Trademark Office ("USPTO") duly and legally issued U.S. Patent No. 10,651,866 ("the '866 Patent"), entitled "Beamforming Using Fractional Time Delay in Digitally Oversampled Sensor Systems, Apparatuses, and Methods." A true and accurate copy of the '866 Patent is attached hereto as Exhibit 2.

45.     On August 3, 2021, the USPTO duly and legally issued U.S. Patent No. 11,082,055 ("the '055 Patent"), entitled "Beamforming Using Fractional Time Delay in Digitally Oversampled Sensor Systems, Apparatuses, and Methods." A true and accurate copy of the '055 Patent is attached hereto as Exhibit 3.

46.     On January 9, 2024, the USPTO duly and legally issued U.S. Patent No. 11,871,174 ("the '174 Patent"), entitled "Personalized Directional Audio for Head-Worn Audio Projection Systems, Apparatuses, and Methods." A true and accurate copy of the '174 Patent is attached hereto as Exhibit 4.

47.     On February 4, 2025, the USPTO duly and legally issued U.S. Patent No. 12,216,339 ("the '339 Patent"), entitled "Eyewear Systems, Apparatuses, and Methods for Providing Assistance to a User." A true and accurate copy of the '339 Patent is attached hereto as Exhibit 5.

48.     Solos is the lawful assignee and exclusive owner of all rights, title, and interest in and to the Asserted Patents, including the right to sue for and recover damages for all past, present, and future acts of infringement.

**BACKGROUND**

**I.    SOLOS' INNOVATIONS AND PATENT PROTECTION**

49.    Solos has continuously researched, designed, engineered, and commercialized head-worn wearable systems for more than a decade. Solos' work encompasses multiple generations of integrated eyewear, marked by advancements in acoustics, optics, sensors, and intelligent contextual-assistance systems.

**A.  Early Years at Kopin Corporation**

50.    Solos' origins trace to Kopin Corporation ("Kopin"), a Massachusetts-based, publicly traded company listed on the NASDAQ and a recognized pioneer in microdisplays, wearable-computing components, and head-worn systems.

51.    For decades, Kopin has designed and manufactured core enabling technologies used in augmented-reality, virtual-reality, and smart-eyewear platforms across consumer, industrial, and defense markets.

52.    Kopin's engineering teams have long focused on solving fundamental challenges in head-worn computing, including display integration, low-power embedded systems, sensor fusion, and human-machine interfaces. It was within this department of Kopin that the early Solos smart-glasses platform was internally conceived and architected before later being spun out into Solos as an independent company.

53.    During this formative period, inventor Ernesto Martinez ("Martinez") led wearable product development at Kopin. He oversaw early smart-glasses architectures that included open-ear audio projection, digital signal processing concepts, sensor integration, and user assistance frameworks. These technologies later formed the foundation of the Asserted Patents.

13

54. Kopin's engineering personnel included those who developed critical aspects of early Solos technology. Solos explored integrated optical modules, directional open-ear audio, chamber-based acoustic structures, digitally oversampled sensor pipelines, and multimodal sensor fusion. The technology matured through sustained multi-year engineering efforts.

55. Following the departments spin-off, Martinez continued to provide direct technical leadership and vision as Co-Founder and as a member of Solos' Board of Directors. He is a named inventor on several of the Asserted Patents, establishing a direct line of development from the early Kopin work to Solos' independent innovations.

## B. Solos' Leadership in Smart Glasses Technology

56. In 2015, Solos had already begun executing an ambitious intellectual-property strategy designed to protect its early breakthroughs in smart-eyewear acoustics and sensing.

57. Between 2015 and 2019, Solos and Kopin filed a series of patent applications that captured foundational architectures for directional audio projection, fractional delay and oversampled sensor beamforming, personalized audio rendering, and multimodal wearable assistance systems.

58. These filings did not claim isolated or incremental improvements. Instead, they documented holistic system designs that combined acoustic chambers, speaker structures, advanced beamforming, sensor arrays, and on-device context processing into unified smart-eyewear platforms.

59. As a result of these early and sustained efforts, Solos secured priority dates for inventions that would later issue as the Asserted Patents. By 2018–2019, Solos had already

received issued patent protection over technologies that years later became defining features of next-generation smart eyewear.

60.     As set forth below, the Defendants were aware of Solos' innovations, its leadership in directional-audio and multimodal-assistance eyewear, and its growing technology portfolio underpinning the Asserted Patents.

### C. Solos' Independence from Kopin and Ownership of the Smart-Glasses Portfolio

61.     In September 2019, Kopin announced that it had entered into an agreement with Solos pursuant to which Kopin sold all assets associated with the Solos™ smart-glasses product line and the Whisper™ audio-processing technology. This transaction included the transfer of core architectures, development tools, and associated intellectual-property rights that formed the backbone of the Solos smart-glasses system. As a result, Solos acquired the full suite of engineering assets and patented technologies foundational to its smart-glasses program.

62.     The transaction marked Solos' operational and technological independence from Kopin.

63.     Several of Kopin's engineering personnel also transitioned to Solos, ensuring continuity of technical expertise and uninterrupted development of the technologies that matured into the Asserted Patents.

64.     Solos' ongoing commercial releases reflect its depth of innovation, with each product generation incorporating advances in acoustics, optics, embedded systems, and user-centric wearable design.

15

II.    **DEFENDANTS' KNOWLEDGE OF SOLOS' TECHNOLOGY AND SUBSEQUENT COMMERCIALIZATION OF INFRINGING PRODUCTS**

### A. Oakley's Early Exposure to Solos' Technology

65.    Beginning in 2015, personnel affiliated with Oakley had direct exposure to Solos' technology. At Interbike 2015 in Las Vegas, Scott Smith ("Smith"), a former senior executive at Oakley, met with Martinez at the Solos booth and tested Solos' early technologies firsthand.

66.    Then, at CES 2016, management-level personnel from Oakley observed and interacted with Solos personnel, where Solos received awards in the wearables category.

67.    Furthermore, in or around January 2019, Martinez shipped a Solos product, the Second-Generation Model, to Smith at Oakley, at Smith's request and for evaluation purposes.

68.    Around that time, Martinez and Smith further communicated by telephone and via LinkedIn regarding potential plans to collaborate. Through these interactions, Smith gained familiarity with Solos' integrated eyewear architecture and open-ear audio approach, including core design principles later reflected in the Infringing Products.

### B. EssilorLuxottica's Exposure to Solos' Technology

69.    In November 2017, Martinez met with Luiz Dias ("Dias") to discuss Solos' technology. Dias was initially Senior Director of Global Product Strategy at Oakley and later became Senior Director, GTM Wearable Tech Product Development at EssilorLuxottica.

70.    At or around the time of the November 2017 meeting, Martinez met with other personnel affiliated with Oakley and EssilorLuxottica at a corporate office in San Francisco, California. During this meeting, Martinez discussed Solos' smart-glasses roadmap, providing senior personnel affiliated with insights into Solos' innovations.

71.    One of the executives present at the meeting was Fabio Borsoi, who at the time served in a senior wearable-technology leadership role within the EssilorLuxottica Group and is currently Global R&D Director of Technology.

72.    Martinez was also invited to corporate facilities of the EssilorLuxottica Group in Italy, where Solos' smart-eyewear concepts were again presented and discussed

73.    Solos also encountered EssilorLuxottica personnel at CES 2018, where it showcased subsequent generations of its smart-glasses system.

74.    Through public demonstrations, including Interbike 2015, CES 2016, CES, 2017, CES 2018, a 2016 Kickstarter campaign, and Ironman race demonstrations, Solos presented high-level smart-glasses functionality such as synchronized audiovisual guidance and performance metrics. As is common for early-stage technical demonstrations, these materials disclosed generalized functionality while omitting the specific embodiments later protected by the Asserted Patents.

75.    Through these repeated interactions, however, EssilorLuxottica was provided with direct knowledge of Solos' design principles, placing it on notice of Solos' technological approach years before they began developing the Infringing Products.

**C.  Meta's Knowledge of Solos' Technology**

76.    Around 2019, Meta and EssilorLuxottica formalized their collaboration to develop Ray-Ban–branded smart glasses. Meta entered this collaboration at a time when personnel affiliated with EssilorLuxottica had already accumulated years of exposure to Solos' innovations through multiple industry interactions, demonstrations, and direct meetings with Solos' engineers and leadership.

77. Meta's awareness of Solos' technology deepened even further before launching the Infringing Products.

78. Most notably, MIT Sloan Fellow Priyanka Shekar ("Shekar") had conducted an in-depth research study beginning in 2020, analyzing Solos' AirGo system and evaluating Solos' differentiated audio, beamforming, and wearable computing architecture.

79. In 2021, Shekar had published a research study "Audio Wearable Product Strategy: Expanding User Experience for Solos Smart Glasses." Shekar's report cited Solos' patents, stating that Solos' technology was "***protected by over 30 patents***" and identifying as one of Solos' "***strengths***" that its "***[p]atented tech can be applied to various form factors to suit use***." Shekar also stated that Solos' innovations were "***[t]echnically superior***." A true and accurate copy of the study is attached hereto as Exhibit 6 (emphasis added).

80. Shekar's study provides an evaluation of Solos' patented architectures. Shekar's study further underscores the commercial significance of Solos' technology by detailing Solos' strengths in open-ear audio, sensor integration, and user-centered wearable computing. These findings provide an external validation of Solos' engineering leadership and aligned with the capabilities embodied in the Infringing Products.

81. When Shekar became a Product Manager at Meta, this knowledge gave Meta internal access to a well-developed study of Solos' patented technologies and their relevance to smart-glasses development.

82. Shekar's transition from analyzing Solos' technology to influencing Meta's product development demonstrates a continuity of knowledge flowing into Meta's smart-glasses pipeline.

83.     By the time Meta and EssilorLuxottica were collaborating on smart-glasses products, both sides possessed detailed familiarity with Solos' technical work, patented architectures, and training-data-driven design approaches.

### D.  Direct Interactions Between Meta and Martinez

84.     In 2022, Meta contacted inventor Martinez regarding potential employment at Meta's Product and Reality Labs divisions.

85.     Meta's outreach was not cursory. Recruiters and senior technical personnel, including Meta's Quang Pham, Jahde Barnes, Steven Heintz, Karl Schultz, and Dan Wetmore, engaged Martinez in discussions that referenced Martinez's work in leading Solos' smart eyewear technologies.

86.     These individuals also connected with Martinez on LinkedIn, which supports an ongoing line of visibility into his engineering background and Solos' innovations.

87.     Martinez's LinkedIn identifies several of the Asserted Patents and highlights the novel architecture and technical contributions those patents protect.

88.     During Meta's communications, Meta representatives asked Martinez questions about Solos' technology, including technology that Solos publicly identifies on its website along with the patents that cover it. These interactions provided Meta with additional notice of Solos' patented technologies.

89.     Martinez's LinkedIn profile and Solos' website offered Meta easily accessible disclosures of Solos' inventive contributions in smart eyewear systems. The information available through these sources reinforced Meta's knowledge of the scope of Solos' patented work.

90.    Furthermore, in 2022, Meta Reality Labs engineer Nathan (Hao) Wang ("Wang") joined Meta as a Technical Program Manager for its augmented-reality and artificial-intelligence platform.

91.    Wang had familiarity with Solos' engineering work and its technical approach to smart eyewear through discussions with Solos Co-Founder and Chief Financial Officer Kenneth Fan ("Fan").

92.    In a Zoom meeting held in June 2024 between Wang and Fan, Wang acknowledged Meta's awareness of Solos' engineering sophistication. During this meeting, Wang indicated to Fan that he was impressed by the technical depth of the Solos team.

93.    Wang further informed Fan that, in 2024, an internal meeting at Meta had taken place in which Solos' smart-glasses were passed around the meeting room and examined. Wang conveyed this after Fan asked whether he wished to try a Solos product, responding that he had already seen the glasses because they had been circulated internally at Meta.

94.    Wang possessed specific and first-hand knowledge of Solos' engineering capabilities, architectural designs, and technical methods and his statements reinforce that Meta had knowledge of Solos' technologies.

95.    Wang's presence within Meta Reality Labs provided Meta with additional insight into Solos' innovations.

**E.  Defendants' Develop and Commercialize the Infringing Products**

96.    By the time Meta jointly commercialized smart-glasses products in or around 2021 with EssilorLuxottica, both sides had accumulated years of direct, senior-level, and increasingly detailed knowledge of Solos' smart-glasses technology.

97.    Meta personnel had studied Solos' products, cited Solos' patents, interacted with inventors, and gained insight into Solos' engineering work, while senior personnel affiliated with EssilorLuxottica had personally tested Solos' technologies across multiple years and industry events.

98.    Solos' Co-Founder and Board Director Martinez had multiple interactions with personnel affiliated with the Defendants.

99.    In parallel, Meta has actively encouraged third-party developers and commercial partners to build applications, services, and product extensions that rely on and invoke these same platform-level capabilities.

100.    Any infringing use by third-party developers or partners is not independent, incidental, or unforeseeable. Instead, it flows directly from Meta's affirmative acts of designing, enabling, promoting, and maintaining a platform architecture that incorporates and depends upon infringing functionalities.

101.    Despite their years-long accumulated knowledge of Solos' technology, Defendants continue to make, use, import, sell, and offer for sale smart-glasses incorporating technology covered by the Asserted Patents within the United States.

102.    On information and belief, Defendants commit the acts herein directly and through their respective subsidiaries, affiliates, agents, contractors, laboratories, distributors, component suppliers, and other instrumentalities, each acting at Defendants' direction, for Defendants' benefit, and under Defendants' control.

103.    As a result of Defendants' conduct, which was undertaken despite longstanding and repeated notice of Solos' patented technologies and coupled with their continued development, launch, Defendants have willfully infringed the Asserted Patents under 35 U.S.C. § 284.

### F.  Common Enterprise, Agency, and Vicarious Liability

104.    On information and belief, Defendants acted not only individually, but also collectively and in concert as part of a coordinated and interdependent enterprise with respect to the design, development, engineering, manufacturing, configuration, testing, branding, marketing, distribution, sale, customer support, software updates, platform services, and ongoing operation of the Infringing Products. Each Defendant played a knowing and material role in bringing the Infringing Products to market, including, without limitation, Meta and EssilorLuxottica with respect to Meta–Ray-Ban products, and Meta and Oakley with respect to Meta–Oakley products.

105.    On information and belief, Defendants further acted through and in combination with their respective subsidiaries, affiliates, officers, employees, agents, contractors, suppliers, component manufacturers, software developers, laboratories, logistics providers, distributors, retailers, and other related persons or entities, which participated in or supported the activities alleged herein with Defendants' knowledge, authorization, and for Defendants' benefit. The precise nature, scope, and degree of direction, coordination, and oversight exercised among these entities, however, are not yet fully known to Plaintiff.

106.    The acts and omissions of each Defendant, and of any entities acting in coordination with them, are legally attributable to the others under principles of agency, apparent authority, joint venture, joint enterprise, authorization, inducement, ratification, vicarious liability, and respondeat superior. Each Defendant is therefore liable for the infringing acts of the others,

including acts undertaken to design, manufacture, import, promote, distribute, sell, offer for sale, support, enable, and monetize the Infringing Products and the ecosystems built around them.

## INFRINGEMENT OF THE ASSERTED PATENTS

107.    Defendants make, use, offer for sale, sell, and import wearable smart-glasses products, including but not limited to, the Infringing Products.

108.    For instance, Meta and EssilorLuxottica jointly launched the Ray-Ban Wayfarer Gen 1 on or around September 2023, incorporating microphone arrays, beamforming architectures, and directional-audio structures that practice one or more claims of each of the Asserted Patents.

109.    The Wayfarer Gen 1 incorporates multiple audio, processing, and sensor components that function in a manner consistent with the limitations of the Asserted Patents. These include microphone structures used for directional and noise-reducing capture, digital processing features used for combining and timing signals, and audio-output elements integrated into the eyewear temples. The product also includes processor-based and sensor-based functions that respond to user and environmental inputs.

110.    These features correspond to the claimed subject matter of the Asserted Patents and constitute use of Solos' patented head-worn audio and sensor-processing technologies without authorization.

111.    The following image depicts a disassembly of the Meta Ray-Ban Wayfarer Gen 1, including its microphone apertures, directional audio ports, temple-housing acoustic chambers, interconnect wiring, optical modules, power systems, and embedded electronics. These components participate in the microphone configurations, audio-processing features, and assistance-system functions that practice the patented technology.

| Disassembly of the Ray-Ban Meta Wayfarer Gen 1 |
| :---: |
|  |

112.    Upon information and belief, the Infringing Products incorporate the same or substantially similar internal acoustic structures, DSP beamforming architectures, microphone geometries, and multimodal sensor systems as the Gen 1. Defendants' later releases are derivative of the Gen 1 platform and continue to implement Solos' patented technologies, resulting in ongoing and continuous infringement.

113.    Defendants' infringing conduct has been continuous and unbroken since at least the commercial release of the Stories in 2021 and persists through all currently available Infringing Products.

---

[2] Intretech secrets of scale, *Meta Ray-Ban Smart Glasses Teardown*, YOUTUBE (Nov. 18, 2023), at 8:09, https://www.youtube.com/watch?v=SbTc-a29dUQ (depicting an internal disassembly of the Ray-Ban Meta Wayfarer Gen 1, including microphones, DSP board, battery packs, integrated speakers, acoustic chambers, lenses, cabling, antenna modules, SoC, and sensor component, arranged systematically around the eyeglass frame.)

114.    The Infringing Products meet each limitation of one or more claims of the '389, '866, '055, '174, and '339 Patents, as demonstrated in the claim-charts attached hereto. True and accurate copies are attached as Exhibits 7–11.

115.    Solos' claim charts involve a representative infringing product, the Wayfarer Gen 1. On information and belief, all Infringing Products practice the same or substantially similar features and functionality that are material to the asserted claims. The representative attached charts are illustrative of and apply to each of the accused products.

| Exemplary, Non-Limiting Example Comparing Selected Figures of the '174 Patent with Images of the Ray-Ban Wayfarer Gen 1 | |
|---|---|
| **The '174 Patent** | **Ray-Ban Wayfarer Gen 1** |
|  |  |

---

[3] U.S. Patent No. 11,871,174, fig.22 (illustrating an eyewear-frame temple housing internal electronics and an acoustic-projection assembly).

[4] META, INC., *AI glasses | Ray-Ban Meta*, https://www.meta.com/ai-glasses/ray-ban-meta/ (last visited November 17, 2025) (depicting the Meta Ray-Ban including integrated electronics within the temple housing and open-ear acoustic emitters positioned along the arm of the eyewear).



116.    Meta directly sells the Infringing Products including on its website at https://www.meta.com/ai-glasses/ray-ban-meta/.

117.    Meta also sells, offers to sell, and distributes the Infringing Products nationwide, including, without limitation, through Ray-Ban retail stores, which are owned, controlled, operated, supplied, and/or supported by EssilorLuxottica, thereby placing the Infringing Products into the commercial stream nationwide.

118.    In addition to Meta's sales and distribution activities, EssilorLuxottica and Oakley offer for sale and sell the Infringing Products through their Ray-Ban and Oakley retail networks nationwide, thereby directly infringing the Asserted Patents.

---

[5] U.S. Patent No. 11,871,174 fig.19 (filed Apr. 18, 2019) (depicting an example implementation of the directional-audio system, in which acoustic output generated within the eyewear's internal chamber is directed toward the user's ear).
[6] *See Ray-Ban Meta*, *supra* note 4 (clicking on the "+" icon on the rear of the temple arm reveals "Open-Air Speakers", illustrating the integrated directional speakers housed within the eyewear frame) (last visited Aug. 11, 2025).

119. As such, Defendants have actively induced, and continue to actively induce, the direct infringement of the Asserted Patents by others, including by instructing and encouraging users to operate the Infringing Products in ways that practice the patented methods and systems.

120. However, Defendants have never had authority or permission from Solos to make, use, offer to sell, sell, import, or induce others to use any product or system covered by the Asserted Patents.

121. By continuing the commercial activities described herein, including after having actual and constructive notice of the Asserted Patents, Defendants are knowingly, deliberately, and willfully infringing the Asserted Patents.

## COUNT I
## Direct and Indirect Patent Infringement of the '389 Patent in violation of 35 U.S.C. § 271

122. Solos realleges and incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

123. Solos is the lawful assignee and exclusive owner of all rights, title, and interest in United States Patent No. 10,306,389 (the '389 Patent), including the right to sue for past, present, and future infringement and to recover all corresponding damages.

124. The '389 Patent is valid, enforceable, and directed to inventive acoustic and microphone-geometry systems designed for head-worn devices.

125. Defendants have directly infringed, and continue to directly infringe, one or more claims of the '389 Patent under 35 U.S.C. § 271(a) by making, using, importing, offering for sale, and selling the Infringing Products and all variations and derivatives thereof. The Infringing Products satisfy all limitations of the asserted claims of the '389 Patent as demonstrated in the claim chart attached as Exhibit 7, which is incorporated herein by reference.

126.    Defendants further indirectly infringe the '389 Patent under 35 U.S.C. § 271(b) by actively inducing customers, retail partners, distributors, and end users to directly infringe one or more claims of the '389 Patent through use of the Infringing Products in their intended and instructed manner. Defendants also provide technical documents, marketing materials, customer-support resources, and advertising campaigns that encourage, direct, or otherwise cause users to operate the Infringing Products in ways that practice the patented technology.

127.    Defendants also indirectly infringe the '389 Patent under 35 U.S.C. § 271(c) by offering to sell and selling components of the Infringing Products that constitute material parts of the claimed inventions. These components are specially made or adapted for infringing use and have no substantial non-infringing use.

128.    Defendants' inducement further includes encouraging and enabling third-party developers, partners, and commercial integrators to build, deploy, and monetize products and services that rely on infringing platform-level capabilities embodied in the Infringing Products.

129.    Defendants have had both actual and constructive notice of the '389 Patent pursuant to at least 35 U.S.C. § 287. Despite this knowledge, Defendants chose to continue developing, launching, and commercializing the Infringing Products. Defendants' infringement has therefore been willful, deliberate, and carried out in reckless disregard of Solos' patent rights.

130.    As a direct and proximate result of Defendants' acts of infringement, Solos has suffered and continues to suffer substantial damages. These harms include, without limitation, lost profits, price erosion, damage to business opportunities, loss of market position, and other forms of injury.

131.    Solos is entitled to recover damages adequate to compensate for Defendants' infringement in an amount to be determined at trial, including without limitation, lost profits and, at a minimum, a reasonable royalty for past, present and future infringement, as well as enhanced damages under 35 U.S.C. § 284 due to Defendants' willful conduct.

132.    Solos is also entitled to injunctive relief under 35 U.S.C. § 283 to prevent Defendants' ongoing and future infringement of the '389 Patent and an award of attorneys' fees and costs under 35 U.S.C. § 285 because this is an exceptional case.

**COUNT II**
**Direct and Indirect Patent Infringement of the '866 Patent in violation of 35 U.S.C. § 271**

133.    Solos realleges and incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

134.    Solos is the lawful assignee and exclusive owner of all rights, title, and interest in United States Patent No. 10,651,866 (the '866 Patent), including the right to sue for past, present, and future infringement and to recover all corresponding damages.

135.    The '866 Patent is valid, enforceable, and directed to inventive techniques for beamforming using fractional time delay in digitally oversampled sensor systems, including signal-processing architectures for improving audio capture in wearable devices.

136.    Defendants have directly infringed, and continue to directly infringe, one or more claims of the '866 Patent under 35 U.S.C. § 271(a) by making, using, importing, offering for sale, and selling the Infringing Products and all variations and derivatives thereof. The Infringing Products satisfy all limitations of the asserted claims of the '866 Patent as demonstrated in the claim chart attached as Exhibit 8, which is incorporated herein by reference.

137.    Defendants further indirectly infringe the '866 Patent under 35 U.S.C. § 271(b) by actively inducing customers, distributors, retail partners, and end users to directly infringe one or more claims of the '866 Patent through use of the Infringing Products in their intended and instructed manner. Defendants also provide technical documents, marketing materials, customer-support resources, and advertising campaigns that encourage, direct, or otherwise cause users to operate the Infringing Products in ways that practice the patented technology.

138.    Defendants also indirectly infringe the '866 Patent under 35 U.S.C. § 271(c) by offering to sell and selling components of the Infringing Products that constitute material parts of the claimed inventions. These components are specially made or adapted for use in infringing the '866 Patent and have no substantial non-infringing use.

139.    Defendants' inducement further includes encouraging and enabling third-party developers, partners, and commercial integrators to build, deploy, and monetize products and services that rely on infringing platform-level capabilities embodied in the Infringing Products.

140.    Defendants have had both actual and constructive notice of the '866 Patent pursuant to at least 35 U.S.C. § 287. Despite this knowledge, Defendants continued developing, launching, and commercializing the Infringing Products. Defendants' infringement has therefore been willful, deliberate, and carried out in reckless disregard of Solos' patent rights.

141.    As a direct and proximate result of Defendants' acts of infringement, Solos has suffered, and continues to suffer, substantial damages. These harms include, without limitation, lost profits, price erosion, damage to business opportunities, loss of market position, and other forms of injury.

142.    Solos is entitled to recover damages adequate to compensate for Defendants' infringement in an amount to be determined at trial, including without limitation, lost profits and, at a minimum, a reasonable royalty for past, present and future infringement, as well as enhanced damages under 35 U.S.C. § 284 due to Defendants' willful conduct.

143.    Solos is also entitled to injunctive relief under 35 U.S.C. § 283 to prevent Defendants' ongoing and future infringement of the '866 Patent and an award of attorneys' fees and costs under 35 U.S.C. § 285 because this is an exceptional case.

**COUNT III**
**Direct and Indirect Patent Infringement of the '055 Patent in violation of 35 U.S.C. § 271**

144.    Solos realleges and incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

145.    Solos is the lawful owner of all rights, title, and interest in United States Patent No. 11,082,055 (the '055 Patent), including the exclusive right to sue for past, present, and future infringement and to recover all corresponding damages.

146.    The '055 Patent is valid, enforceable, and directed to systems and methods for processing signals from multiple microphones and sensors, including techniques for combining, timing, and enhancing those signals to improve audio capture and performance in wearable devices.

147.    Defendants have directly infringed, and continue to directly infringe, one or more claims of the '055 Patent under 35 U.S.C. § 271(a) by making, using, importing, offering for sale, and selling the Infringing Products and all variations and derivatives thereof. The Infringing Products satisfy all limitations of the asserted claims of the '055 Patent as demonstrated in the claim chart attached as Exhibit 9, which is incorporated herein by reference.

31

148.    Defendants further indirectly infringe the '055 Patent under 35 U.S.C. § 271(b) by actively inducing customers, distributors, retail partners, and end users to directly infringe one or more claims of the '055 Patent through use of the Infringing Products in their intended and instructed manner. Defendants also provide technical documents, marketing materials, customer support resources, and advertising campaigns that encourage, direct, or otherwise cause users to operate the Infringing Products in ways that practice the patented technology.

149.    Defendants also indirectly infringe the '055 Patent under 35 U.S.C. § 271(c) by offering and selling components that constitute material parts of the claimed inventions. These components are specially made or adapted for use in infringing the '055 Patent and have no substantial non-infringing use.

150.    Defendants' inducement further includes encouraging and enabling third-party developers, partners, and commercial integrators to build, deploy, and monetize products and services that rely on infringing platform-level capabilities embodied in the Infringing Products.

151.    Defendants have had both actual and constructive notice of the '055 Patent pursuant to at least 35 U.S.C. § 287. Despite this knowledge, Defendants continued developing, launching, and commercializing the Infringing Products. Defendants' infringement has therefore been willful, deliberate, and carried out in reckless disregard of Solos' patent rights.

152.    As a direct and proximate result of Defendants' acts of infringement, Solos has suffered, and continues to suffer, substantial damages. These harms include, without limitation, lost profits, price erosion, damage to business opportunities, loss of market position, and other forms of injury.

153.     Solos is entitled to recover damages adequate to compensate for Defendants'
infringement in an amount to be determined at trial, including without limitation, lost profits and,
at a minimum, a reasonable royalty for past, present and future infringement, as well as enhanced
damages under 35 U.S.C. § 284 due to Defendants' willful conduct.

154.     Solos is also entitled to injunctive relief under 35 U.S.C. § 283 to prevent
Defendants' ongoing and future infringement of the '055 Patent and an award of attorneys' fees
and costs under 35 U.S.C. § 285 because this is an exceptional case.

**COUNT IV**
**Direct and Indirect Patent Infringement of the '174 Patent in violation of 35 U.S.C. § 271**

155.     Solos realleges and incorporates by reference the allegations of the preceding
paragraphs as though fully set forth herein.

156.     Solos is the lawful assignee and exclusive owner of all rights, title, and interest in
United States Patent No. 11,871,174 (the '174 Patent), including the right to sue for past, present,
and future infringement and to recover all corresponding damages.

157.     The '174 Patent is valid, enforceable, and directed to inventive audio delivery
systems for eyewear, including speaker modules, acoustic chambers, digital signal processing, and
temple-embedded audio structures for user-directed sound projection.

158.     Defendants have directly infringed, and continue to directly infringe, one or more
claims of the '174 Patent under 35 U.S.C. § 271(a) by making, using, importing, offering for sale,
and selling the Infringing Products and all variations and derivatives thereof. The Infringing
Products satisfy all limitations of the asserted claims of the '174 Patent as demonstrated in the
claim chart attached as Exhibit 10, which is incorporated herein by reference.

159.     Defendants further indirectly infringe the '174 Patent under 35 U.S.C. § 271(b) by actively inducing customers, distributors, retail partners, and end users to directly infringe one or more claims of the '174 Patent through use of the Infringing Products in their intended and instructed manner. Defendants also provide technical documents, marketing materials, customer support resources, and advertising campaigns that encourage, direct, or otherwise cause users to operate the Infringing Products in ways that practice the patented technology.

160.     Defendants also indirectly infringe the '174 Patent under 35 U.S.C. § 271(c) by offering and selling components that constitute material parts of the claimed inventions. These components are specially made or adapted for use in infringing the '174 Patent and have no substantial non-infringing use.

161.     Defendants have had both actual and constructive notice of the '174 Patent pursuant to at least 35 U.S.C. § 287. Despite this knowledge, Defendants continued developing, launching, and commercializing the Infringing Products. Defendants' infringement has therefore been willful, deliberate, and carried out in reckless disregard of Solos' patent rights.

162.     Defendants' inducement further includes encouraging and enabling third-party developers, partners, and commercial integrators to build, deploy, and monetize products and services that rely on infringing platform-level capabilities embodied in the Infringing Products.

163.     As a direct and proximate result of Defendants' acts of infringement, Solos has suffered, and continues to suffer, substantial damages. These harms include, without limitation, lost profits, price erosion, damage to business opportunities, loss of market position, and other forms of injury.

164.    Solos is entitled to recover damages adequate to compensate for Defendants' infringement in an amount to be determined at trial, including without limitation, lost profits and, at a minimum, a reasonable royalty for past, present and future infringement, as well as enhanced damages under 35 U.S.C. § 284 due to Defendants' willful conduct.

165.    Solos is also entitled to injunctive relief under 35 U.S.C. § 283 to prevent Defendants' ongoing and future infringement of the '174 Patent and an award of attorneys' fees and costs under 35 U.S.C. § 285 because this is an exceptional case.

**COUNT V**
**Direct and Indirect Patent Infringement of the '339 Patent in violation of 35 U.S.C. § 271**

166.    Solos realleges and incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

167.    Solos is the lawful assignee and exclusive owner of all rights, title, and interest in United States Patent No. 12,216,339 (the '339 Patent), including the right to sue for past, present, and future infringement and to recover all corresponding damages.

168.    The '339 Patent is valid, enforceable, and directed to inventive sensor-integrated, context-aware, and multimodal smart-eyewear architectures.

169.    Defendants have directly infringed, and continue to directly infringe, one or more claims of the '339 Patent under 35 U.S.C. § 271(a) by making, using, importing, offering for sale, and selling the Infringing Products and all variations and derivatives thereof. The Infringing Products satisfy all limitations of the asserted claims of the '339 Patent as demonstrated in the claim chart attached as Exhibit 11, which is incorporated herein by reference.

170.    Defendants further indirectly infringe the '339 Patent under 35 U.S.C. § 271(b) by actively inducing customers, distributors, retail partners, and end users to directly infringe one or

more claims of the '339 Patent through use of the Infringing Products in their intended and instructed manner. Defendants also provide technical documents, marketing materials, customer support resources, and advertising campaigns that encourage, direct, or otherwise cause users to operate the Infringing Products in ways that practice the patented technology.

171.    Defendants also indirectly infringe the '339 Patent under 35 U.S.C. § 271(c) by offering and selling components that constitute material parts of the claimed inventions. These components are specially made or adapted for use in infringing the '339 Patent and have no substantial non-infringing use.

172.    Defendants' inducement further includes encouraging and enabling third-party developers, partners, and commercial integrators to build, deploy, and monetize products and services that rely on infringing platform-level capabilities embodied in the Infringing Products.

173.    Defendants have had both actual and constructive notice of the '339 Patent pursuant to at least 35 U.S.C. § 287. Despite this knowledge, Defendants continued developing, launching, and commercializing the Infringing Products. Defendants' infringement has therefore been willful, deliberate, and carried out in reckless disregard of Solos' patent rights.

174.    As a direct and proximate result of Defendants' acts of infringement, Solos has suffered, and continues to suffer, substantial damages. These harms include, without limitation, lost profits, price erosion, damage to business opportunities, loss of market position, and other forms of injury.

175.    Solos is entitled to recover damages adequate to compensate for Defendants' infringement in an amount to be determined at trial, including without limitation, lost profits and,

at a minimum, a reasonable royalty for past, present and future infringement, as well as enhanced damages under 35 U.S.C. § 284 due to Defendants' willful conduct.

176.    Solos is also entitled to injunctive relief under 35 U.S.C. § 283 to prevent Defendants' ongoing and future infringement of the '339 Patent and an award of attorneys' fees and costs under 35 U.S.C. § 285 because this is an exceptional case.

## DEMAND FOR JURY TRIAL

Plaintiff Solos Technology Limited demands a trial by jury on all issues and causes of action so triable pursuant to Fed. R. Civ. P. 38 and any other applicable law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Solos Technology Limited respectfully requests that the Court enter judgment in its favor against Defendants Meta Platforms, Inc., Meta Platforms Technologies, LLC, Oakley, Inc., Luxottica of America, Inc., and EssilorLuxottica USA, Inc., and award the following relief:

1.    A judgment that each Defendant has infringed, directly and indirectly, one or more claims of the Asserted Patents under 35 U.S.C. § 271;

2.    A temporary restraining order, preliminary injunction, and permanent injunction enjoining Defendants and all persons or entities in active concert or participation with them, including but not limited to any parents, subsidiaries, affiliates, successors, assigns, agents, contractors, manufacturers, distributors, suppliers, or other persons or entities acting at their direction, for their benefit, or under their control, from further acts of infringement of U.S. Patent Nos. 10,306,389; 10,651,866; 11,082,055; 11,871,174; and 12,216,339;

3.      An award of damages adequate to compensate Solos for Defendants' infringement of the Asserted Patents, but in no event less than a reasonable royalty, together with pre-judgment and post-judgment interest and all other monetary relief permitted by law;

4.      An award of enhanced damages under 35 U.S.C. § 284, including treble damages, based on Defendants' willful and deliberate infringement;

5.      A declaration that this case is "exceptional" under 35 U.S.C. § 285 and an award to Solos of its reasonable attorneys' fees, costs, and expenses incurred in connection with this action;

6.      An order requiring Defendants to provide an accounting of all infringing sales, revenues, units distributed, and any other relevant financial information relating to the Infringing Products;

7.      An order for disgorgement of all profits wrongfully obtained by Defendants as a result of their infringement;

8.      Restitution, including any other equitable relief necessary to prevent Defendants from retaining benefits obtained through infringement;

9.      Such other and further relief as the Court may deem just, proper, and equitable.

Respectfully submitted,

Dated: January 23, 2026

/s/ Jameson J. Pasek
Jameson J. Pasek (BBO# 692924)
jameson@caldwelllaw.com
Steve Wang (BBO# 709800)
steve@caldwelllaw.com
Keegan M. Caldwell (*pro hac vice forthcoming*)
keegan@caldwelllaw.com
CALDWELL
200 Clarendon Street, 59th Floor
Boston, MA 02116
(857) 990-4914

## TABLE OF EXHIBITS

Exhibit 1 – U.S. Patent No. 10,306,389

Exhibit 2 – U.S. Patent No. 10,651,866

Exhibit 3 – U.S. Patent No. 11,082,055

Exhibit 4 – U.S. Patent No. 11,871,174

Exhibit 5 – U.S. Patent No. 12,216,339

Exhibit 6 – Priyanka Shekar's study titled "Audio Wearable Product Strategy: Expanding User Experience for Solos Smart Glasses"

Exhibit 7 – 10,306,389 Patent Claim Chart

Exhibit 8 – 10,651,866 Patent Claim Chart

Exhibit 9 – 11,082,055 Patent Claim Chart

Exhibit 10 – 11,871,174 Patent Claim Chart

Exhibit 11 – 12,216,339 Patent Claim Chart