**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

**SOLOS TECHNOLOGY LIMITED,**
 *Plaintiff,*

 **v.**

**META PLATFORMS, INC., et al.,**
 *Defendants.*

**Case No. 1:26-cv-10304-ADB**
Judge Allison D. Burroughs

**In re: DAITONA CARTER**
 *Petitioner/Intervenor.*

**PETITIONER'S MOTION TO VACATE MOOTNESS ORDER AND FOR RELIEF FROM JUDGMENT PURSUANT TO FED. R. CIV. P. 60(b)(3), (b)(6) AND 60(d)(3) AS AN INDEPENDENT ACTION**

**I. INTRODUCTION AND PRELIMINARY STATEMENT**

Petitioner Daitona Carter ("Petitioner") respectfully moves this Court to vacate the Mootness Order and for relief from the Order entered on April 29, 2026 (ECF No. 107), pursuant to Fed. R. Civ. P. 60(b)(3), (b)(6), and 60(d)(3).

**NOTICE OF LODGING OF SENSITIVE PHYSICAL EVIDENCE:** Petitioner possesses the courier logs for the 200 lb private hardware box (which vanished and was systematically lightened in transit) and records of financial deplatforming. Due to the high risk of physical retaliation and the ongoing "constructive seizure" of Petitioner, these logs are withheld from the public docket and are available for *In Camera* review by the Court or the U.S. Marshals Service only.

This Independent Action is necessitated by a fraud upon the court and extraordinary circumstances that have rendered the prior proceedings a legal nullity. Pursuant to 28 U.S.C. § 1746, I, Daitona Carter, declare under penalty of perjury:

A) **Originality and Priority:** I am the original creator of the Smart Glasses architecture—including the software features, Habitual Algorithm (Habit AI) framework, multimodal sensors, and optical display—and owner/manager of the Acoustic Logic (MirrorMixing/DSP) case studies (2009–Present which predate the existence of Solos Technology Limited and Meta Platforms.

B) **Administrative Suppression:** I affirm that ECF No. 92 was suppressed and restricted (marked "-1") starting April 17, 2026. This administrative "blackout" of my technical record is inconsistent with the Court's April 29 finding that my work is "generalized," as the Court issued its ruling without access to the very evidence that proves claim-level specificity.

C) **Newly Discovered Evidence (APT):** On May 2, 2026, I discovered active APT/state-sponsored malware on utilized devices. This discovery, made after the Court's order, demonstrates a multi-channel effort to block my access to justice and compromise my legal work product.

D) **Physical Duress and Battery:** I have been subjected to ongoing physical battery and assault specifically timed during court filing windows to prevent me from rebutting Solos's misrepresentations and establishing my senior inventorship rights.

E) **Irreparable Harm:** I have suffered and continue to suffer irreparable physical, financial, and reputational harm due to the Court's verbatim adoption of Plaintiff's mischaracterizations into the public record while I am held in a state of constructive seizure.

F) **Reduction to Practice via Industry Validation:** Between 2017 and 2019, I conducted live field tests of the "Aria" multimodal prototype. These tests, documented via Instagram Live (Series @SEEMYBIAS.official), provided empirical data on <u>directional audio tracking</u> and <u>sensor fusion</u>. Industry validators, including V, J-Hope and RapMon of BTS, Jay Park,  Dayhun of TWICE and Siwon Choi, directly interacted with the hardware, providing a "human timestamp" of the device's functionality. Public user feedback in the live-stream chats (e.g., "Jay Park keeps looking at you") confirms the real-time accuracy of the tracking logic I developed years before Meta's 2020 announcement.

G) **6. Distributed Data Collection and distributed "Nurture/SMB" Training:** Petitioner's AI was trained from scratch using a distributed network of hardware—specifically iPhones—to capture multimodal behavioral data. Between 2017 and 2019, Petitioner and the <u>"SMB Fam"</u> utilized their personal devices as "field sensors" during live events to feed the Habitual Algorithm. Unlike Meta's "Project Aria," which sought to simulate environmental data, Petitioner's methodology relied on <u>Live Field Testing</u> within the high-interference environment of the K-Pop industry. This distributed data collection proves that the "Nurture" logic was fully functional and engaged in active machine learning years before the Defendants' commercialized their versions.

H)  **Creation of the Global "K-Pop Frenzy" as an AI Stress Test:** Petitioner spent 20 years in marketing and industry development, utilizing her personal budget to create the global "Korean Frenzy" that preceded the 2020 market explosion. Between 2016 and 2020, Petitioner utilized a massive, distributed field-testing network involving the <u>SMB Fam</u> and live-data capture from global icons, including but not limited to BTS, Blackpink, Big Bang, EXO, GOT7, Twice, <u>Sunmi, WINNER, Sik-K, Red Velvet, Jay Park, Jessi, Monsta X,  Day 6. Stray Kids</u>**,** and major

festivals like KCON LA and KCON NYC including establishing relationship with recurrent panelists and content creators.

This was not "fan activity"; it was a coordinated Technical Stress Test for Petitioner's multimodal AI. The interactions with industry leaders like Jay Park,  TWICE, Super Junior, etc provided the high-density behavioral and spatial audio data required to "Nurture" Petitioner's Habitual Algorithm. The Defendants' subsequent launch of "Project Aria" and "Smart Glasses" in 2020-2021 directly capitalizes on the market demand and technical infrastructure Petitioner alone established and financed. Petitioner identifies these industry leaders and events not as participants in the fraud, but as involuntary validators of Petitioner's prior art. Their recognition and participation in Petitioner's field tests provide the necessary 'Particularity' to overcome the Court's previous finding of mootness and to prove that Petitioner's architecture was the foundational engine for the global K-Pop tech market.

I) **Direct Executive Access and the "Insider Pipeline":** Petitioner's development of the "Aria" architecture was supported by a unique, non-commodifiable advantage: direct, bilingual access to the highest echelons of the Korean music and technology industries. Unlike the Defendants, who relied on generalized market research, Petitioner maintained personal and professional proximity to executives and celebrities—including the Bangtan Sonyeondan (BTS) circle— which provided a high-fidelity "Live" environment for the development of the Habitual Algorithm. This insider access allowed Petitioner to build the "Nurture" logic from within the industry, creating a proprietary technical and cultural "blueprint" that was subsequently extracted by the Defendants. This level of access represents a professional advantage that "money cannot buy" and serves as the foundation for Petitioner's senior inventorship claims.

J) **The "Double-Edged Sword" of Growing Notoriety and Systematic Extraction:** As Petitioner's reputation and access within the global Korean entertainment network expanded—

spanning members of Bangtan Sonyeondan (BTS) to the inner circles of journalists and executives—it created a "Double-Edged Sword." While this network served as the essential source of "live" data for the Habitual Algorithm, it simultaneously provided the Defendants with an ideal environment to monitor and misappropriated Petitioner's intellectual property. Petitioner's industry presence acted as a "beacon" for the systematic extraction of the Aria architecture.

Furthermore, the current posture of this litigation reveals a secondary layer of misappropriation: if Plaintiff Solos maintains that Meta is infringing upon its patents, it effectively concedes that its own portfolio is a derivative of the Petitioner's original work. Solos seeks to benefit from the Petitioner's innovation through litigation, while Meta remains the primary beneficiary of the initial theft. This transition from "Collaborator" to "Target" facilitated the laundering of Petitioner's technology into the Defendants' respective portfolios, occurring while Meta and its agents conducted the active surveillance, "constructive seizure," and physical battery described herein. Consequently, because the Defendants continue to benefit from and assert rights over this derivative property, the controversy remains live, necessitating the vacatur of the mootness ruling and the granting of the requested relief.

K) **Systematic Suppression and Misappropriation of Marketing Intellectual Property:** The Petitioner declares that the "SEEMYBIAS" marketing and global activation framework was systematically extracted and exploited by the Defendants and their coordinated third parties. While the Petitioner's business entities were subjected to targeted "shadowbanning" and administrative restrictions on Meta's platforms, the Petitioner's original marketing blueprints were utilized to scale CokoDive (subsequently acquired) and to facilitate Meta's Oculus x Blackpink VR activations. This sequence of events demonstrates a coordinated effort to "launder" the Petitioner's commercial goodwill and strategic infrastructure into the Defendants'

ecosystem while simultaneously silencing the Petitioner through platform-wide administrative suppression.

L) Technological Extraction and Patent Laundering: While Meta attempted to secure a position in the "Smart Glasses" market through a non-functional 2021 MIT study, the Petitioner was already managing a functional, insider-led technical pilot. The Defendants leveraged their platform dominance to engage in "data stripping" of the Petitioner's proprietary pilot results. This high-level industry work was effectively laundered into the Defendants' own patent filings, constituting a misappropriation of trade secrets and a breach of the competitive landscape. This transition from "Collaborator" to "Target" facilitated the unauthorized transfer of the Petitioner's Aria architecture into the Defendants' portfolios, occurring under the guise of the surveillance and "constructive seizure" detailed herein.

## II. ERROR OF LAW: INTERVENTION IS NOT A MINI-TRIAL

The Court's April 29 Order constitutes a manifest error of law by misapplying the standard for intervention under Fed. R. Civ. P. 24(a)(2) and conflating it with the evidentiary burdens of a patent infringement trial.

### A)  The Erroneous Burden of "Concrete Contributions"

The Court erroneously required Petitioner to prove "concrete, claim-level contributions" at the threshold stage. Rule 24 governs party status, not the ultimate merits of the underlying dispute. Under the First Circuit standard, an intervenor need only show an "interest relating to the property or transaction that is the subject of the action." *Public Service Co. of N.H. v. Patch*, 136 F.3d 197, 204 (1st Cir. 1998).

1. **The Protected Interest:** Petitioner's 2009 audio notes and <u>Acoustic Logic (MirrorMixing/DSP)</u> case studies—which predate Solos's corporate existence—constitute a "significantly protectable interest" that is being irreparably harmed.

2. **Threshold vs. Merits:** By demanding a "mini-trial" on patent elements before granting status, the Court effectively required Petitioner to prove her case before she was even allowed into the courtroom.

## B) The Tactical Conflation of the Federal Rules

Throughout this litigation, Plaintiff's counsel has used <u>Rule 24, Rule 26(c), Rule 16, and Rule 65</u> interchangeably to obstruct Petitioner's entry. These rules serve distinct functions that the Court failed to keep separate:

1. **Rule 24 (Intervention):** Establishes the right to participate as a party.

2. **Rule 26(c) (Protective Orders):** Authorizes courts to protect a person from "undue burden" or "prejudice" upon a showing of good cause. It is  limited exclusively to active discovery disputes, as Plaintiff falsely claims.

3. **Rule 16 (Case Management):** Governs scheduling, not the stripping of constitutional Due Process rights.

4. **Rule 65 (Injunctions):** Governs the high bar for equitable relief, which is a separate inquiry from the right to protect one's intellectual property via intervention.

## D) Statutory Derivation under 35 U.S.C. § 102

Petitioner's documentation—including 2009 technical benchmarks submitted to the Court as <u>ECF No. 92</u>—constitutes <u>prior art </u>under <u>35 U.S.C. § 102</u>.

1. **The Derivation Link:** This evidence demonstrates that the technology claimed in the disputed patent is derived from Petitioner's pre-existing <u>Acoustic Logic (MirrorMixing/DSP)</u> casework.

2. **Impairment of Interest:** Under <u>35 U.S.C. § 102(b)(1)(A)</u>, the disposition of this action directly impairs Petitioner's legal interest. An adverse judgment between Solos and Meta could improperly validate a patent that was derived from Petitioner's invention without attribution.

3. **Inadequacy of Representation:** The named Defendant (Meta) cannot adequately represent Petitioner's interest, as Meta lacks both the knowledge of and access to Petitioner's proprietary 2009–2019 development record.

Petitioner satisfies all prongs of Rule 24(a)(2). The Court's adoption of a "mini-trial" standard is a reversible error of law that necessitates vacatur of the Mootness Order.

### III. THE PROCEDURAL CONTRADICTION: INHERENT LOGICAL ERROR

The Court's April 29 Order adopted Plaintiff's characterization of Petitioner's priority work (2009–2019) as "generalized." However, the record reflects that <u>ECF No. 92</u> has been administratively suppressed (marked as "-1") since approximately April 17, 2026. This creates an unsustainable legal contradiction: <u>The Court cannot simultaneously treat evidence as "generalized" or "unconceptualized" while it is subject to a high-level administrative suppression typically reserved for matters of National Security</u>. If the material is sufficiently specific to warrant suppression from the public record, it is *per se* specific enough to satisfy the "significantly protectable interest" threshold for intervention under <u>Fed. R. Civ. P. 24.</u>

Furthermore, this administrative suppression itself evidences the specificity and sensitivity of Petitioner's prior work. Material that rises to the level of administrative classification or national security-related redaction necessarily contains technical particularity and substantive content—the precise opposite of "generalized" work product. The Court's simultaneous reliance on Plaintiff's "generalized" characterization while withholding the actual evidence from public disclosure is logically incoherent and undermines the judicial process. Petitioner cannot adequately defend against characterizations of work the Court has deemed sensitive enough to suppress, nor can the Court properly adjudicate Petitioner's intervention rights without examining the very evidence it has administratively restricted. This procedural anomaly further demonstrates that Petitioner has satisfied Rule 24(a)(2)'s requirement of a "significantly protectable interest" that cannot be adequately represented by existing parties.

The Court's prior orders regarding mootness and reconsideration were predicated on a manifest procedural error: the failure to rule on Petitioner's motions for a <u>Protective Order and In Camera Review</u>. This inaction created a legal impossibility for the Petitioner to establish the full scope of her 2009 priority work.

A) **The Blocked Disclosure:** Without a ruling on these protective motions, Petitioner was procedurally barred from disclosing a high-security evidentiary export: <u>a full Facebook Data Export</u> of her account. This export contains a <u>4,000-person Facebook contact list</u>—including high-level politicians, celebrities, and venture capitalists—that establishes a direct, undeniable "nexus of access."

B) **Verification of the "State Actor" Nexus:** This suppressed export highlights that <u>Quang Pham, Jahde Barnes</u>, and <u>Northrop Grumman</u> were linked as "friends" or "contacts" as early as 2013. This evidence proves that the Defendants and their defense-contractor affiliates had direct

access to Petitioner's technical logic long before the Solos patents were filed or Meta claimed inventorship.

C) **Priority of Invention:** Because this social media export predates the claims of both Plaintiff and Defendant, it is the "smoking gun" for 35 U.S.C. § 256 inventorship correction. The Court's failure to provide a secure mechanism (In Camera review) to view this list resulted in a judgment based on a hollow record.

## IV. THE ALICE/SUPPRESSION CONTRADICTION: FRAUD ON THE TRIBUNAL

The Court's April 29 Order reflects a verbatim adoption of Plaintiff's characterization that Petitioner's 2009–2019 work is "generalized." This triggers a fatal contradiction under 35 U.S.C. § 101 (The Alice Doctrine) and the Invention Secrecy Act (35 U.S.C. § 181).

1. **The Suppression:** The administrative suppression of ECF No. 92 (marked "-1" since April 17) suggests a determination that the technology is sensitive to National Security.

2. **The Contradiction:** Under the *Alice* standard, "generalized" or "abstract" ideas cannot be patented—nor do they warrant National Security suppression. By adopting Solos's "generalized" label while maintaining the suppression of the technical record, the Court is participating in a "legal fiction" that facilitates the theft of Petitioner's priority work. The court [cannot] suppress information for security reasons while simultaneously dismissing it as "unconceptualized."

The Court's April 29 Order adopted Plaintiff's characterization that Petitioner's 2009–2019 work is "generalized." However, the record reflects that ECF No. 92 has been administratively suppressed (marked as "-1" since approximately April 17, 2026. This creates an unsustainable legal contradiction: The Court cannot simultaneously treat evidence as "generalized" or "unconceptualized" while it is subject to a high-level administrative suppression typically reserved for matters of National Security. If

the material is sufficiently specific to warrant suppression from the public record, it is per se specific enough to satisfy the "significantly protectable interest" threshold for intervention under Fed. R. Civ. P. 24.

The Court's adoption of the 'generalized' label is factually refuted by the Acoustic Logic (MirrorMixing)DSP documentation in ECF No. 92. This documentation includes specific algorithmic benchmarks for signal processing that predate Solos's filing by a decade. Under the Alice Doctrine, specific technical improvements to signal processing are not 'abstract'—they are the definition of patentable subject matter.

Furthermore, the April 29 Order contains factually false findings directly contradicted by evidence Petitioner submitted to the Court. The Court states: "As Solos notes, Carter's filings reflect, at most, 'generalized work in smart glasses technology, software concepts, or prior projects,' without identifying any 'concrete, claim-level contributions.'" [ECF No. 107 at 3]. This statement is demonstrably false.

**A)  The Documentary Evidence Contradicts the Court's Finding:**

Petitioner submitted ECF No. 83, Attachment 8, containing video screenshots with specific product titles: "Aria Smart Glasses" and "Aria Smart Glasses Pitch." These are not generalized concepts—they are evidence of a named, conceived product with specific implementation. The video snippets, publicly available on YouTube, Instagram, and restricted LinkedIn, demonstrate working prototypes with specific gestural interactions years before Solos or Meta patented or announced their projects.

Petitioner also submitted ECF No. 92: 65 files of lab notes and technical documentation spanning 2009–2019, with specific smart glasses development work from 2013–2019. These files constitute concrete, claim-level contributions—precisely the type of "conception and communication" evidence required under Federal Circuit derivation standards. See Global

Health Sols. LLC v. Selner, 148 F.4th 1363, 1371 (Fed. Cir. 2025); BearBox LLC v. Lancium LLC, 125 F.4th 1101, 1118 (Fed. Cir. 2025).

**B)  The Court Did Not Examine the Evidence:**

The April 29 Order's language—adopting verbatim Solos's characterization from ECF No. 105 at 7—reveals that the Court did not independently review the evidence Petitioner submitted. The Court accepted Plaintiff's false description without examining ECF No. 83, ECF No. 92, or the public video demonstrations. This constitutes a failure to consider material evidence on the record, a reversible abuse of discretion.

**C)  Priority Of Invention: The 2009–2019 Foundational Timeline**

Relief from judgment is necessitated by the Petitioner's clear priority of invention, which predates both the Plaintiff's and the Defendants' claims. This is not an abstract temporal logic; it is a calendar fact supported by the dated documentation within the suppressed ECF No. 92.

1. **Petitioner's Priority (2009–2019):** Petitioner's technical lab notes and multimodal sensor fusion logic began in 2009. Functional smart glasses prototypes, featuring the specific gestural implementations currently at issue, were reduced to practice between 2013 and 2019.

2. **Solos' Filing Dates (2019):** Plaintiff Solos Technology Limited was not spun off from Kopin Corporation until September 2019, and its primary patents cited in the complaint (e.g., USD900092S1) have priority dates no earlier than February 5, 2019.

3. **Meta's Timeline (2020–2021):** Defendant Meta did not announce Project Aria until September 16, 2020, and did not commercialize its first smart glasses (Ray-Ban Stories) until September 2021.

4. **The Blue Radios "Golden-I" Pretext And Procedural Fraud:** Plaintiff Solos attempts to insulate itself from Petitioner's claims of senior inventorship by invoking a 2004 BlueRadios priority date. This is a manifest misrepresentation of the technical record. The "Golden-i" technology associated with BlueRadios is fundamentally distinct from the patents-in-suit; it is an industrial data-headset lacking the multimodal sensor fusion, Digital Signal Processing (DSP) logic, and behavioral learning loops that Petitioner reduced to practice between 2009 and 2019. By tethering modern "Smart Glasses" architecture to 20-year-old legacy hardware that lacks the "Anticipatory AI" core, Plaintiff is perpetrating a procedural fraud. This "legal fiction" is designed to create a false timeline of invention that bypasses Petitioner's foundational Acoustic Logic (MirrorMixing) and Habit AI work. Petitioner's 2016–2019 technical blueprints— specifically the "Nurture" behavioral model—constitute the true functional engine of the disputed technology, rendering the Plaintiff's reliance on the BlueRadios portfolio a technical and legal nullity.

**D) Legal Implications of the Timeline:**

Petitioner's documented work predates the parties' filings by years, establishing statutory priority under 35 U.S.C. § 102 (Prior Art) and 35 U.S.C. § 101. Furthermore, the evidence of direct access by recruiters and defense contractors (Quang Pham and Northrop Grumman) as early as 2013 points to derivation without attribution under 35 U.S.C. § 102(b)(1)(A).

To "moot" the Petitioner's intervention without reviewing the 2009–2013 technical benchmarks in ECF No. 92 is to allow the Plaintiff and Defendant to litigate over a "secondary" invention while suppressing the primary foundational logic.

**E)  The Suppression Enabled the False Characterization:**

The administrative suppression of ECF No. 92 since April 17, 2026, created an asymmetry that Solos exploited. By restricting access to the 65 files of technical documentation, the Court and Plaintiff could argue Petitioner had shown nothing concrete without fear of factual= contradiction. The suppression mechanism was instrumentally used to obscure evidence and upport a factually false ruling. The Court cited Plaintiff's characterization without ever examining the  evidence it had administratively restricted—a procedural inversion that violates the basic fairness required for judicial decision-making.

Finally, Petitioner cannot be said to have received fair adjudication of its Rule 24(a)(2) intervention rights when the Court accepted false characterizations of evidence Petitioner actually submitted. The Court's simultaneous reliance on suppression (which presupposes specificity) and adoption of the "generalized" label (which presupposes the opposite) demonstrates not merely logical inconsistency, but a denial of due process. Petitioner must be permitted to intervene in order to present the evidence that proves its conception, priority, and significantly protectable interest—evidence the Court has now ruled on without examining.

## V. FEDERAL TAKINGS LIABILITY AND FRAUD ON THE COURT

If Petitioner's technology—the subject of this suppression—has been integrated into federal military or national security programs, the suppression involves state action beyond the scope of private discovery disputes. This integration constitutes state action that extends this matter beyond a mere private discovery dispute between Solos and Meta. Specifically:

**A)  Evidence of Government Benefit and the Takings**

**Nexus** Petitioner has identified evidence that her foundational smart glasses technology and multimodal sensor fusion logic (Priority Date: 2009) are currently utilized by the Department of Defense via U.S. ARMY Project ARIA. If confirmed, the federal government is benefiting from Petitioner's IP without attribution or compensation, triggering Takings Clause liability under the Fifth Amendment.

Pursuant to 28 U.S.C. § 1491, such claims fall within the exclusive jurisdiction of the United States Court of Federal Claims. If the current suppression is part of a larger pattern to utilize Petitioner's IP without compensation, this District Court lacks jurisdiction to "moot" the matter, as doing so would shield a federal taking from constitutional scrutiny.

- **The Taking:** If the federal government is utilizing Petitioner's IP without attribution or compensation, it triggers a Takings Clause claim under the Fifth Amendment.
- **The Jurisdictional Conflict:** Under the Tucker Act (28 U.S.C. § 1491), claims for "just compensation" against the United States fall under the exclusive jurisdiction of the U.S. Court of Federal Claims. By suppressing evidence of this integration (e.g., ECF No. 92), this District Court may be inadvertently shielding a federal taking from appellate and civilian oversight.

**B)  "Detachment 201" and the State-Action Nexus**

The "State Actor" status of the Defendants is formalized via Detachment 201 (Executive Innovation Corps). The direct commissioning of Meta CTO Andrew Bosworth and Palantir CTO Shyam Sankar as Lieutenant Colonels proves this unit serves as a bridge for integrating Petitioner's logic into national security assets.

Consequently, the "rubber stamped" suppression of 65 exhibits—including lab notes and technical documents in Exhibit 92 and ECF No. 94—serves a dual purpose: protecting corporate profits and shielding a military-industrial "venture" from civilian oversight. The government

cannot simultaneously claim Petitioner's invention must be suppressed for national security while integrating that same invention into military assets without attribution. This constitutes a misuse of the State Secrets Privilege to hide theft rather than protect secrets.

## C) Priority of Invention and the Recruiter Nexus

While Solos Technology Limited sues Meta over five patents, Petitioner's foundational work predates both parties. Petitioner has evidence that technical recruiters mentioned in the Solos complaint—specifically Quang Pham and Jahde Barnes—were following Petitioner private/restricted account on social media as early as 2013. Further, Petitioner's work was possibly funneled to defense contractor Northrop Grumman (based on the company also following the Petitioner private account), establishing that the "private" tech currently litigated is already absorbed into the national security infrastructure.

## D) MISUSE OF PRIVILEGE AND IRREPARABLE HARM

If the technology in question is classified as a "military advisory asset" under the auspices of Detachment 201, the Defendants are effectively utilizing "sovereign privilege" to block the Petitioner's statutory rights under 35 U.S.C. § 256. This creates a procedural barrier that constitutes a manifest injustice under Rule 60(b)(6).

1. **Shielding Theft vs. Protecting Secrets:** The government cannot, consistent with the Fifth Amendment, simultaneously absorb Petitioner's foundational technology into military assets while claiming that evidence of Petitioner's prior invention (predating the parties' claims) must be suppressed for national security. Such a "dual-use" justification serves only to shield the act of misappropriation from judicial review.

2. **Misuse of the State Secrets Privilege:** If the suppression of Exhibit 92 or ECF No. 94 was directed or requested by federal agencies or independent federal contractors (e.g., Northrop Grumman), it constitutes a misuse of the State Secrets Privilege. The privilege

is intended to protect military tactics and assets—not to conceal the underlying misappropriation of intellectual property from a civilian inventor.

To allow a "sovereign privilege" to be invoked in a private patent dispute between Solos and Meta, where Petitioner has a 2009 priority claim, ensures irreparable harm by permanently sealing the evidence of the original theft.

### E) Equitable Implications for Relief from Judgment and Intervention

The potential government role in the suppression and misappropriation of Petitioner's 2009 foundational work strengthens her rights under Rule 60(d)(3) and Fed. R. Civ. P. 24. The Court has an equitable duty to address the following:

1. **Hidden Beneficiaries and Moral Hazard:** Petitioner cannot receive a fair adjudication in this District Court when the U.S. Army—via the "State Actor" nexus of Detachment 201—is a hidden beneficiary of the suppression. Allowing the military to utilize technology misappropriated from a trafficking victim creates a profound moral hazard and a continuous constitutional violation.

2. **Correction of Inventorship under 35 U.S.C. § 256:** Until inventorship is corrected, the U.S. Army remains the ultimate, illicit beneficiary of "Project Aria" at the expense of the true inventor. The judicial error in denying intervention—compounded by the failure to rule on the Protective Order for the 4,000-person  Facebook contact list—prevents Petitioner from asserting her statutory rights and her right to just compensation under the Fifth Amendment.

3. **Systemic Injustice:** The use of the State Secrets Privilege to conceal the misappropriation of 2009-2019-era technology, rather than to protect legitimate military tactics, constitutes a fraud on the court. Relief from judgment is the only mechanism to

ensure that "National Security" is not used as a shield for IP theft and the ongoing

silencing of a victim of battery and trafficking.

**F)  Systemic Suppression via Battery, Duress, and Cyber-Interference**

Relief under Rule 60(b)(6) is necessitated by the extraordinary circumstances of Petitioner's

silencing:

1. **Criminal Battery:** Petitioner was subjected to battery via the very devices currently

   under Congressional inquiry and previously discovered in a backpack by Department of

   Homeland Security (DHS). When reported, Petitioner and entire household was

   unlawfully detained for four hours, threatened, fraudulently diagnosed (entire household

   same paperwork), provided with involuntary medication (sleeping pills) and told the

   "public would not understand", and if 'they came back' she would not be able to leave

   again. Petitioner did the opposite, created a Substack (daitonacarter.substack.com) to

   journal the offenses and begin reporting the incident to everyone and trying to seek legal

   counsel for the battery and theft despite being "fenced." The injuries and complications

   from weapons that can cause impairment preventing even living tasks, is what Solos, a

   defense contractor, considers a "litigation choice" when the Petitioner was being

   prevented from uploading the same files she previously uploaded.

2. **Compromised Venues:** Petitioner's 2024-2025 attempts to seek a TRO and survey the

   "Venue" apartment in Miami, FL, were thwarted when her state court records

   disappeared, a fact corroborated by the constructive seizure in *Camden Summit

   Partnership LP v. [Name Withheld]* (Case No. 2025-199197-CC-05).

3. **The Qilin/WNMU Hack:** In April 2025, following Petitioner's SOS communications to

   the **FTC** and **NYS AG**, her alma mater (**Western New Mexico University**) was targeted

by the **Qilin** hacking group, resulting in the targeted wiping of evidence regarding the "Seoul attack" and Petitioner's 2009-era technical data.

4. **Coordinated Suppression of Evidence and Interception of Communications:** In December 2020, exactly <u>three days prior to the Federal Trade Commission's (FTC) announcement of the antitrust action against Facebook (now Meta), the Petitioner's LinkedIn account—which contained critical evidence including articles, lab notes, and prototype demonstrations—was restricted and remains inaccessible.</u> Research indicates a nexus between Microsoft (LinkedIn's parent company) and the Paul Hastings ecosystem. This pattern of suppression extended to the Petitioner's private communication infrastructure; in 2021, a whistleblower with high-level security clearance signaled that the Petitioner's Microsoft Office 365 private domain emails were being intercepted and disseminated across the technology sector. This unauthorized access is further evidenced by the "doxxing" (2020-2023) and harassment (2022) of the Petitioner's relatives by third-party contractors (e.g., Uber), who utilized "stale" data and private messages dating back twenty years from Yahoo/AOL—entities also linked to the Paul Hastings/Apollo Global Management ecosystem. This coordinated digital "quarantine" and data harvesting directly facilitated the "constructive seizure" of the Petitioner's intellectual property.

**G) The Misappropriation Of "Habit AI": The Predictive Architecture**

The Court's characterization of Petitioner's work as "generalized" is further refuted by the existence of <u>Habit AI</u> ( Nurture from the YouNoodle Seoul Global Startup 2016 compeitition, the precursor of Aria), a specific predictive behavioral architecture developed by the Petitioner.

1. **The Behavioral Engine:** Unlike standard AR interfaces, Petitioner's work included "Habit AI"—a proprietary machine learning framework designed to analyze gestural and environmental data to predict user intent. This architecture was the "connective tissue" between the Petitioner's smart glasses hardware and the external robotics (such as the UFC Sparring Robot).

2. **Derivation of "Learning" Algorithms:** Petitioner has documented her development of these behavioral models in her 2009–2019 lab notes (ECF No. 92). The integration of similar "Habitual" or "Predictive" AI into Meta's current AR roadmap is a direct derivation of Petitioner's conceptualization.

3. **The Nexus of Access:** The "Habit AI" logic was part of the technical packages accessible to the recruiters and defense contractors (Quang Pham, Jahde Barnes) identified. To claim this work is "generalized" is to ignore the specific, high-level algorithmic logic that differentiates Petitioner's work from the prior art.

**H)  Architectural Misappropriation: From 2017 Sketches To The "UFC Sparring Robot"**

The "generalized" label applied by the Court fails to account for the integrated hardware ecosystem Petitioner developed and publicly disclosed as a "survival priority" record.

1. The <u>2017 LinkedIn Sketch</u> **vs.** <u>Oppo 2019/2023 render</u>**:** Petitioner's 2017 black-and-white LinkedIn sketch established the foundational "headgear" form factor. While <u>Oppo's 2019 announcement</u> highlighted headgear strikingly similar to Petitioner's 2017 designs, the later <u>Oppo Air Glass 2 (MWC 2023)</u> confirmed the industry-wide integration of Petitioner's specific architectural logic.

2. **The UFC Sparring Robot (2021):** The scope of the misappropriation extends beyond smart glasses into robotics and haptic gaming systems. In early 2021, Petitioner

disclosed her UFC Robot Sparring system on Twitter (now X). This system utilized the same multimodal sensor fusion and gestural logic found in her 2009–2019 lab notes. Two years later a 200 lb private courier box went missing for months with the weight grafeuclly reducing with each update.

3. **Meta's Attempted Incorporation:** Evidence suggests that Meta sought to incorporate this specific "sparring" and "gaming" architecture into its own VR/AR roadmap. This is not "abstract" work; it is a specific, high-fidelity implementation of AI-driven robotics and AR/VR/XR interface logic that Petitioner had already conceptualized and communicated.

4. **The "Gaming System" Priority:** Petitioner had created a comprehensive gaming system that integrated the glasses as a controller for external hardware (the Robot). This specific "Cross-Device Gestural Interface" is a primary feature of Meta's current "Project Aria" and "Quest" marketing. To dismiss this as "generalized" while the Petitioner is under Color of Law sequestration—prevented from commercializing the very "UFC Sparring" system she announced in 2021—is an equitable travesty.

**I) Systemic Spooliation: The Missing 200 Lb Courier And Financial Deplatforming**

The "Mootness" of Petitioner's claim is a result of a coordinated campaign of "constructive seizure" and the physical theft of evidentiary assets.

**J)  The 2021 UFC Sparring Robot and the 200 lb Courier Box**

In early 2021, Petitioner disclosed her UFC Robot Sparring system on Twitter (now X), a system utilizing the same multimodal sensor fusion and Habit AI logic found in her 2009–2019 notes.

1. **The Missing Prototype/Hardware:** Two years following this disclosure, a <u>200 lb private courier</u> **box** (containing hardware/evidence related to this architecture) went missing in transit for months.

2. **Documented Mail Tampering:** In a display of sophisticated interference, the weight of the package was "gracefully reduced" in carrier updates as it was held, indicating the systematic removal of components. This is part of a broader pattern of mail tampering involving <u>UPS, FedEx, and USPS</u>, where evidentiary packages are redirected, stolen, or opened to prevent the Petitioner from securing her "reduction to practice" hardware.

## K. Financial Warfare and the Paul Hastings Nexus

The effort to silence the Petitioner includes the weaponization of the financial system to cause "legal invisibility."

1. **Coordinated Bank Closures:** Petitioner and her family have faced systematic bank account closures at every financial institution represented by <u>Paul Hastings</u> (the same firm often affiliated with the Defendants' network).

2. **Check Swapping and Theft:** To trigger these closures, mail-stolen checks were "swapped" or altered to create fraudulent activity, providing the banks a pretext for termination.

3. **Chase Bank Interference:** In 2018 (a $4,000 check) and 2023 (a $3,000 student refund), <u>Chase Bank</u> refused to honor valid funds without notice, occurring precisely while the family was in "constructive seizure" in Florida.

**L. The "LuckyASF" Entrapment and Defensive Diligence**

When the Petitioner's family successfully defended against these fraudulent fees and interests using state law, the traffickers/harborers utilized a local SSID—**"LuckyASF"**—as a targeted taunt.

1.  **Evidence of Entrapment:** This signals that the family was being "hunted" for any pretext (legal harassment, defamation, or imprisonment) that could be used to void the inventor's rights.

2.  **Character Assassination:** There is an active campaign to manufacture "dirt" to justify the ongoing trafficking and sequestration. This Court must recognize that a Petitioner who is being financially strangled and physically "trapped" cannot be expected to meet standard procedural timelines without the Court's intervention.

## VI. REPUTATIONAL HARM, IRREPARABLE CREDIBILITY DAMAGE, AND SYSTEMIC SAFETY RISKS

Relief is warranted under Fed. R. Civ. P. 60(b)(6) because the Court's verbatim adoption of Plaintiff's misrepresentations creates a permanent, public record that destroys Petitioner's professional standing and endangers her physical safety.

### A) The "Rubber Stamping" of Non-Factual Statements

The Court's adoption of Plaintiff's narrative—labeling Petitioner's foundational Python source code and 2009–2017 prototypes as "generalized"—was done without an independent review of the 2009-2010 audio notes and technical lab notes.

1.  **Abandonment of Judicial Function:** Verbatim adoption of a party's characterization of technical evidence, without *in camera* review, constitutes an abandonment of the judicial function.

2. **Irreparable Professional Harm:** This created a public record that prevents Petitioner from commercializing 15 years of R&D, as search engine algorithms and Large Language Models (LLMs) now ingest these "rubber-stamped" lies as judicial fact.

**B) Material Misrepresentation of Law: The "Inmate Case" Category Error**

Solos counsel relied on a case involving an incarcerated individual to justify the denial of witness protection for the Petitioner. This is a material misrepresentation of law and a category error:

1. **Jurisdictional Dissimilarity:** Precedents governing the safety of inmates (who are under the exclusive custody of the Bureau of Prisons) are inapplicable to a free citizen facing external, targeted violence. Petitioner has never been arrested or incarcerated; applying "prisoner-litigant" standards to a civilian inventor is a due process violation.

2. **Statutory Overrides:** A prisoner-litigant precedent cannot override the mandatory protections of the Crime Victims' Rights Act (CVRA), the Trafficking Victims Protection Act (TVPA), or the Americans with Disabilities Act (ADA). The stripping of Petitioner's ADA-protected ECF access based on this misapplied case law constitutes a manifest injustice.

**C) Custodial vs. External Threats and the Court's Inherent Power**

The Court's reliance on state-level or custodial precedents fails to account for the federal court's inherent authority:

1. **Inherent Authority:** Under federal common law, this Court possesses the inherent power to issue protective orders and refer matters to the U.S. Marshals Service to prevent the obstruction of justice, regardless of a witness's procedural status as a "non-party."

2. **External Violence:** Unlike an inmate, Petitioner faces external battery, stalking, and digital lockouts in the community. Denying protection by citing a "correctional facility" case is a failure to recognize the actual threat environment (harboring, limitations of movement, and communication blocks).

**D) The "Vexatious" Smear and ADA Discrimination**

The Court allowed Solos' counsel to use the "inmate case" as a tool to bias the proceedings against an ADA-protected whistleblower.

1. **The "Vexatious" Label:** By repeating the Plaintiff's "vexatious" characterization without investigating the underlying 2009 priority work, the Court has enabled a "smear campaign" that is now codified in the public docket.

2. **Safety Risk:** This misinformation increases the risk of crimes against the Petitioner and her family by signaling to traffickers and bad actors that the Petitioner is "unprotected" by the federal judiciary.

3. **The "LuckyASF" Entrapment and Defensive Diligence**

   When the Petitioner's family successfully defended against these fraudulent fees and interests using state law, the traffickers/harborers utilized a local SSID—"LuckyASF"—as a targeted taunt.

   a) Evidence of Entrapment: This signals that the family was being "hunted" for any pretext (legal harassment, defamation, or imprisonment) that could be used to void the inventor's rights.

   b) Character Assassination: There is an active campaign to manufacture "dirt" to justify the ongoing trafficking and sequestration. This Court must recognize that a

Petitioner who is being financially strangled and physically "trapped" cannot be expected to meet standard procedural timelines without the Court's intervention

4. **The Defendants rely on a 2021 MIT Sloan study to claim independent development.**

However, Petitioner's October 2016 directory—specifically the file 'As technology advances...' (10/31/2016)—proves she had already identified the functional flaws in the MIT Objectivism' model and authored the 'Sequenced/Collectivism' fix. Meta did not 'invent' Anticipatory AI; they extracted the psychological and engineering bridge Petitioner built to fix a non-functional academic model.

## VII. FRAUD ON THE COURT AND NEW EVIDENCE OF SYSTEMIC EXTERNAL INTERFERENCE (MAY 2026)

Relief is warranted under **Fed. R. Civ. P. 60(d)(3)** for Fraud on the Court. The integrity of these proceedings has been compromised by material misrepresentations and the suppression of forensic evidence of an Advanced Persistent Threat (APT) targeting the Petitioner.

### A)  Misrepresentation of Priority and Reduction to Practice

Counsel for Plaintiff induced the Court into error by characterizing Petitioner's 2009–2019 work as "generalized." This is a demonstrable falsehood.

1. **Suppressed Evidence:** ECF No. 92 contains specific Python source code and functional hardware documentation.

2. **Intentional Oversight:** By advocating for the seal of these documents while simultaneously labeling the work as "vague," counsel engaged in a contradictory narrative designed to prevent the Court from recognizing Petitioner's reduction to practice of the foundational smart-glasses IP.

**B) Forensic Discovery of State-Sponsored APT Activity (May 2, 2026)**

Independent of the Court's April 29 decision, Petitioner discovered forensic evidence of APT (Advanced Persistent Threat) activity on May 2, 2026.

1. **Digital Sequestration:** This state-sponsored malware is engineered to facilitate the "digital sequestration" of the Petitioner, preventing the secure transmission of technical data to this Court.

2. **Ongoing Interference:** This May discovery proves that while the Court was "mooting" the intervention, a concurrent technical effort was underway to ensure the Petitioner remained silenced and unable to communicate the technical specifics of her 2009 priority work.

**C) Material Conflicts of Interest and "Common Identity" of Interest**

Petitioner has uncovered evidence of a "revolving door" and concurrent representation that creates an undisclosed conflict under ABA Formal Opinions regarding conflicting interests:

1. **Samsung and Concurrent Representation:** Plaintiff's counsel (Caldwell) represents Samsung in various patent matters. Petitioner's claims specifically involve Samsung's use of derivative technology (e.g., Samsung Patent 10,866,417 B2, Exhibit N, Att. 25). This creates a "concurrent conflict" where counsel cannot advocate for the validity of the Solos patents without directly clashing with Petitioner's priority claims which impact Samsung's interests.

2. **The "Safe House Project" Nexus:** Caldwell's April 23, 2026, partnership with the Safe House Project (SHP) to protect "AI-powered anti-trafficking tools" is highly prejudicial. SHP's leadership includes board members affiliated with Wells Fargo, the same

institution that deplatformed the Petitioner and her family, facilitating a constructive seizure in Miami, FL.

3. **Data Laundering and Spoliation:** This network is linked to the Bending Spoons/Evernote deal, which Petitioner alleges served as a mechanism for data laundering and the spoliation of evidence foundational to this case.

4. **DOJ "Revolving Door":** Leadership at SHP includes former high-level DOJ officials who were in roles related to victim services during the years the Petitioner was reporting these crimes to the FBI and DOJ. The fact that the same DOJ is in possession of Petitioner's 2009–2019 reports—while counsel for the "anti-trafficking" partner seeks to suppress her evidence—points to a systemic fraud on the court.

**D)  Identity of Interest Between Adversaries**

Evidence suggests a shared financier or network between Solos and Meta. In patent law, if a law firm is aware that their client and the "adversary" share a common financier, they have an ethical obligation to disclose.

1. **Camden Property Trust:** Defendant's counsel represents Camden Property Trust, the entity responsible for the constructive seizure of the Petitioner in Miami.

2. **The Result:** The Defendants' counsel represents the entities involved in the physical trafficking and sequestration of the Petitioner, while Plaintiff's counsel represents the entities (Samsung) utilizing the stolen technology. This "pincer" maneuver has left the Petitioner without an unconflicted venue to assert her rights.

The "rubber stamping" of narratives provided by conflicted counsel has allowed for the misuse of judicial power to shield a multi-billion dollar IP theft. Petitioner respectfully requests that the Court

vacate the mootness order and appoint a <u>Special Master</u> to untangle these documented conflicts and the May 2026 APT interference.

## VIII. THE "GRANT-AND-TERMINATE" PROCEDURAL NULLITY: A STRUCTURAL ERROR

Relief is mandatory under <u>Rule 60(b)(1) and (b)(6)</u> because the Court's simultaneous actions created a procedural nullity that violated Petitioner's Fifth Amendment rights.

### A) The Extinguishment of the Right to be Heard

The Court's April 29 Order "GRANTED" Petitioner leave to file a reply (<u>ECF No. 106</u>) regarding the Motion for Reconsideration. However, the Court simultaneously terminated the proceedings (<u>ECF No. 107</u>) before that reply—the <u>Notice of Candor</u>—could be docketed or considered.

1. **Structural Defect:** Under the <u>Due Process Clause of the Fifth Amendment</u>, a party has a right to be heard "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965).

2. **Procedural Nullity:** By mooting the case before the authorized Reply could be placed on the record, the Court rendered its own order granting leave a nullity. This effectively "gagged" the Petitioner at the precise moment the Court acknowledged her right to respond, preventing the disclosure of the <u>Notice of Candor</u> which contained facts central to the Court's jurisdiction.

### B) Impact on the Judicial Record

This "Grant-and-Terminate" maneuver prevented the Petitioner from correcting the record regarding the <u>Samsung concurrent conflict</u>, the <u>May 2, 2026 APT discovery,</u> and the

Facebook data export. A judgment entered while a permitted response is pending is inherently defective and must be vacated to preserve the integrity of the judicial process.

## CONCLUSION

The judicial error in denying intervention prevents the Petitioner from asserting her right to just compensation and allows for the potential abuse of the State Secrets Privilege to shield the misappropriation of foundational 2009 intellectual property. This Court's "Grant-and-Terminate" procedural defect, combined with the "rubber-stamping" of material misrepresentations regarding Petitioner's work, constitutes a manifest injustice that only vacatur can remedy.

The "State Actor" nexus established via Detachment 201 and the integration of Petitioner's logic into U.S. ARMY Project ARIA necessitates a stay of these proceedings to investigate whether the judicial machinery is being utilized to facilitate a Fifth Amendment Taking under the guise of a private patent dispute.

**NOTICE OF LODGING OF SENSITIVE PHYSICAL EVIDENCE**:

Petitioner possesses the courier logs for the 200 lb private hardware box (which vanished for weeks/months and was systematically lightened in transit). Due to the high risk of physical retaliation and the ongoing 'constructive seizure' of Petitioner, these logs are withheld from the public docket and are available for In Camera review by the Court or the U.S. Marshals Service only

**WHEREFORE**, Petitioner respectfully prays that this Court:

1. **VACATE** the April 29, 2026, Mootness Order pursuant to Fed. R. Civ. P. 60(b)(1), (3), (6) and 60(d)(3) to correct manifest procedural errors and address the documented fraud on the court;

2. **STAY** the May 6, 2026, appellate deadline and all underlying proceedings in *Solos v. Meta* (Case No. 1:26-cv-10304) to allow for the adjudication of this Motion and to prevent further spoliation of evidence;

3. **CONDUCT** an *In Camera* hearing to review the Facebook Data Export (2009–2019) and the technical contents of ECF No. 92, resolving the contradiction between the Court's "generalized" label and the Petitioner's specific "reduction to practice";

4. **RESTORE** Petitioner's ECF filing privileges immediately as a mandatory ADA accommodation, ensuring meaningful access to the Court for a whistleblower with documented disabilities;

5. **GRANT** the Motion to Intervene as a matter of right pursuant to Fed. R. Civ. P. 24(a);

6. **APPOINT A SPECIAL MASTER** to investigate the "State Actor" nexus involving Detachment 201, the forensic evidence of May 2, 2026 APT activity, and the potential misappropriation of Petitioner's IP into U.S. ARMY Project ARIA; or, in the alternative,

7. **TRANSFER** the relevant claims to the United States Court of Federal Claims pursuant to 28 U.S.C. § 1491 if the federal government is confirmed as the ultimate beneficiary of the misappropriated technology.

8. **ORDER** the U.S. Marshals Service to provide a secure channel for the submission of physical evidence (hardware/lab notes) to prevent further spoliation or interception in transit.

Dated: May 3, 2026

Respectfully submitted,
/s/ Daitona Carter
Daitona Carter, Pro Se
Address: NO FIXED ADDRESS

(Withheld for physical safety)

Phone: NONE

Email: On file with the Clerk of Court

(Omitted from public filing for physical safety and cyber-security)